UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | | |
|---|---|---|
| THERESA MOORE o/b/o J. L. M., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:10-cv-834 |
| | ) | |
| v. | ) | Honorable Paul L. Maloney |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |
| _____ | ) | |

This is a social security action brought under 42 U.S.C. § 1383(c)(3) seeking review

of a final decision of the Commissioner of Social Security finding that plaintiff was not entitled to

child's supplemental security income (SSI) benefits.  On November 26, 2004, Theresa Moore filed

an application for SSI benefits on behalf of her son, J. L. M., alleging disability based on attention

deficit hyperactivity disorder (ADHD) and asthma.  (A.R. 55-57).  Plaintiff claimed a September 1,

2001 onset of disability.[1]  His claim was denied on initial review.  (A.R. 51-54).  On January 10,

2008, plaintiff received a hearing before an administrative law judge (ALJ), at which he was

represented by counsel. (A.R. 453-93). On March 25, 2008, the ALJ issued a decision finding that

plaintiff was not disabled.  (A.R. 15-26).  On June 24, 2010, the Appeals Council denied review

(A.R. 5-7), and the ALJ's decision became the Commissioner's final decision.

---

[1]SSI benefits are not awarded retroactively for months prior to the application for benefits.
20 C.F.R. § 416.335;  *see Kelley v. Commissioner*, 566 F.3d 347, 349 n.5 (3d Cir. 2009); *see also
Newsom v. Social Security Admin.*, 100 F. App'x 502, 504 (6th Cir. 2004).  The earliest month in
which SSI benefits are payable is the month after the application for SSI benefits is filed.  Thus,
December 2004 is plaintiff's earliest possible entitlement to SSI benefits.

On August 20, 2010, plaintiff filed his complaint seeking judicial review of the Commissioner's decision denying his claim for SSI benefits. The three issues raised by plaintiff are as follows:

1.    The ALJ failed to consider plaintiff's severe asthma, rhinitis and sinusitis and whether these impairments met or equaled listings 103.02(C) and 103.03(B);

2.    The ALJ failed to find "marked" limitations in at least two domains of functioning or a "severe" limitation in at least one domain of functioning; and

3.    "The ALJ failed to conduct a proper credibility analysis of claimant or claimant's witnesses in clear violation of SSR 96-7p and *Rogers v Comm'r of Social Security*, 486 F.[3d] 234 (6th Cir. 2007)."

(Statement of Errors, Plf. Brief at 2, docket # 8). Upon review, I find that plaintiff's arguments do not provide a basis for disturbing the Commissioner's decision. I recommend that the Commissioner's decision be affirmed.

## Standard of Review

When reviewing the grant or denial of social security benefits, this court is to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner correctly applied the law. *See Elam ex rel. Golay v. Commissioner*, 348 F.3d 124, 125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001). Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Heston v. Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see Rogers v. Commissioner*, 486 F.3d 234, 241 (6th Cir. 2007). The scope of the court's review is limited. *Buxton*, 246 F.3d at 772. The court does not review the evidence *de novo*, resolve conflicts in evidence, or make credibility determinations. *See Walters*

*v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Commissioner*, 474 F.3d 830, 833 (6th Cir. 2006). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference." *Buxton*, 246 F.3d at 772-73. "If supported by substantial evidence, the [Commissioner's] determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently." *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996) ("[E]ven if the district court -- had it been in the position of the ALJ -- would have decided the matter differently than the ALJ did, and even if substantial evidence also would have supported a finding other than the one the ALJ made, the district court erred in reversing the ALJ."). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003); *see Kyle v. Commissioner*, 609 F.3d 847, 854 (6th Cir. 2010).

### Standard for Finding Disability on a Child's Claim for SSI Benefits

Under the Work Opportunity Act's standard,[2] a child seeking SSI benefits can establish disability only by showing that he suffers from a medically determinable physical or mental impairment which results in marked and severe functional limitations and lasts for a period of not

---

[2] Personal Responsibility & Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, §§ 211-12, 100 Stat. 2105, 2188-94 (1996).

less than twelve months.  42 U.S.C. § 1382c(a)(3)(C)(i).  "The thrust of the legislation was most certainly to tighten eligibility."  *Encarnacion ex rel. George v. Barnhart*, 331 F.3d 78, 83 (2d Cir. 2003).  Under the current three-step analysis, the Commissioner must ask:  (1) is the claimant engaged in substantial gainful activity?; (2) are the impairments severe?; and (3) do the impairments meet, medically equal, or functionally equal in severity a listed impairment and satisfy the durational requirements?  *See Elam ex rel. Golay v. Commissioner*, 348 F.3d at 125; 20 C.F.R. § 416.924(a). As a result of the Work Opportunity Act, a child claimant must meet or equal a listed impairment in order to qualify for SSI benefits.[3]  *See* 20 C.F.R. § 416.924(d)(2); *see also Encarnacion*, 331 F.3d at 84; *Miller ex rel. Devine v. Commissioner*, 37 F. App'x 146, 148 (6th Cir. 2002).

By regulation, the ALJ utilizes six domains of functioning to assist him in determining whether the combination of a minor's impairments equal the severity of a listed impairment:  (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) the claimant's ability to care for himself; and (6) the claimant's health and physical well-being.  20 C.F.R. § 416.926a(b)(1). Impairments must result in "marked" limitations in two domains or "extreme" limitations in one domain before they meet or equal a listed impairment's severity.  20 C.F.R. § 416.926a(d); *see Kelly*

---

[3]"The standard rationale for this curious-seeming extension of the benefits program for disabled adults is . . . that having a disabled child may limit the amount of productive work that the parents can do, inflicting hardship on families of limited means.  But since disabled children generally do not have a work history, the structure of the disability program for them necessarily differs from that for adults, except in cases in which the child has a 'listed impairment,' that is, an impairment that would entitle the adult to disability benefits without any further inquiry into his ability to work; the child is treated the same in such a case.  Otherwise the question is whether the child is severely limited in functioning in specified areas of life activity such as concentration and communication, which correspond to activities that adults perform at work.  Thus a child is entitled to benefits if his impairment is as severe as one that would prevent an adult from working."  *Sanchez v. Barnhart*, 467 F.3d 1081, 1082 (7th Cir. 2006)(citations and internal quotations omitted).

*v. Commissioner*, 314 F. App'x 827, 832 (6th Cir. 2009); *Encarnacion*, 331 F.3d at 85. A "marked" limitation "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). "'Marked' limitation also means a limitation that is 'more than moderate' but 'less than extreme.' It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id.*; *see Kelly*, 314 F. App'x at 832. An "extreme" limitation is more than a "marked" limitation. An "extreme" limitation is the rating given to the "worst limitations." 20 C.F.R. § 416.926a(e)(3)(i). An "extreme" limitation "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." *Id*. "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." *Id.*; *see Kelly*, 314 F. App'x at 832.

## Discussion

Plaintiff was born in November 1998. He was 9 years old as of the date of the ALJ's decision. He was a school-age child at all times relevant to his claim for SSI benefits. (A.R. 18). Plaintiff has never engaged in substantial gainful activity. (A.R. 18). The ALJ found that plaintiff had the following severe impairments: "speech language delay and asthma." (A.R. 18). Plaintiff did not have an impairment or combination of impairments which met or equaled the requirements of any listed impairment. (A.R.18). The ALJ found that plaintiff had less than marked limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, caring for himself, and health and physical well-being. Plaintiff's only marked limitation was in the area of moving about and manipulating objects. (A.R. 18-25). Because

plaintiff did not have an impairment or combination of impairments which met or equaled the requirements of a listed impairment, the ALJ held that plaintiff was not disabled.  (A.R. 25-26).

## 1.

Plaintiff argues that the ALJ "failed to consider" his asthma, rhinitis, and sinusitis and whether these impairments met or equaled listings 103.02(C) and 103.03(B).  (Plf. Brief at 10-11; Reply Brief at 2-4).  The two listed impairments invoked by plaintiff contain the following requirements:

103.02 *Chronic pulmonary insufficiency*.  With:

* * *

C. Frequent need for:
    1.    Mechanical ventilation; or
    2.    Nocturnal supplemental oxygen as required by persistent or recurrent episodes of hypoxemia.

* * *

103.03 *Asthma* With:

* * *

B.    Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention occurring at least once every two months or at least six times a year.  Each inpatient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks.

20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 103.02(C), 103.03(B).  It is well established that a claimant must show that he satisfies all the individual requirements of a listing.  *See Elam ex rel. Golay v. Commissioner*, 348 F.3d at 125.  "If all the requirements of the listing are not present, the claimant does not satisfy that listing."  *Berry v. Commissioner*, 34 F. App'x 202, 203 (6th Cir. 2002).  "It is insufficient that a claimant comes close to satisfying the requirements of a listed impairment."  *Elam*, 348 F.3d at 125.

The ALJ found that plaintiff did not meet or equal the requirements of any listed impairment. (A.R. 18). Plaintiff's medical records reveal that his impairments did not come close to satisfying the requirements of listing 103.02 for chronic pulmonary insufficiency or listing 103.03 for asthma. He did not have chronic pulmonary insufficiency as required by listing 103.02 and did not experience asthma "attacks" as required by listing 103.03.

Plaintiff claimed a September 1, 2001 onset of disability. Medical records from September and October 2001 indicate that plaintiff was 2½ years old and had a cold, cough, and a runny nose. (A.R. 298-99). In 2002 and 2003, Wayne F. Little, M.D., treated plaintiff for a variety of minor ailments. (A.R. 407-16).

On May 12, 2003, plaintiff was examined by Physician's Assistant Erik Kennedy. Plaintiff had a slight wheeze and drainage from his nose. Plaintiff was diagnosed as having sinusitis and bronchitis and was provided with prescriptions for Zithromax and Zyrtec. (A.R. 395-96). On May 19, 2005, Physician's Assistant Kennedy noted that the Zyrtec was working. He substituted Cefzil for Zithromax. (A.R. 393). On August 22, 2003, Roger Smith, M.D., conducted plaintiff's preschool physical. Plaintiff was 4 years old. Dr. Smith described plaintiff as "healthy." The only medical complaint was that the Zyrtec was not providing adequate allergy control. Dr. Smith prescribed Singulair. (A.R. 391). Plaintiff's September 21, 2003 chest x-rays were normal. (A.R. 139, 418).

On October 27, 2003, plaintiff was examined by Matt Ciesielski, D.O. Plaintiff's mother stated that he had recently been seen in the emergency room for an upper respiratory infection. (A.R. 389). She reported that plaintiff had been taking his medications for six months

with little improvement.   Dr. Ciesielski noted that plaintiff would be referred to "pediatric pulmonology for a better direction of his care."  (A.R. 389).

On February 25, 2004, Dr. Smith examined plaintiff.  Plaintiff's mother reported that he had been taken to Bronson Hospital two days earlier for shortness of breath.  (A.R. 387). Plaintiff's chest x-rays were normal.  (A.R. 139).  His lungs were clear to percussion.  He had some inspiratory and expiratory wheezing with scattered rhonchi, which disappeared on coughing.  Dr. Smith started plaintiff on Cefzil, indicated that he would arrange for plaintiff to be evaluated by a pediatric pulmonologist, and recommended a consultation with an allergist.  (A.R. 137-38, 386-88). On March 8, 2004, Dr. Smith reported that plaintiff had "improved remarkably."  His lungs were clear.  (A.R. 384).  Dr. Smith arranged for plaintiff to be examined on April 26, 2004, by Dr. Marks, a pediatric pulmonologist at the Kalamazoo Center for Medical Studies (KCMS).  (A.R. 136). KCMS records reflect the appointment (A.R. 301-03), but there are no medical records indicating that plaintiff appeared for his appointment.

On September 28, 2004, plaintiff's grandmother brought him to the emergency room at Bronson Hospital.  She stated that plaintiff had been a passenger in a motor vehicle accident earlier in the day.  Plaintiff had no symptoms other than a sore neck.  He was diagnosed as having a minimal cervical strain and was treated with Tylenol and ibuprofen.  (A.R. 420-28).

On December 8, 2004, plaintiff received his "six-year checkup" from Dr. Smith. Plaintiff was described as a "[h]ealthy, vigorous, six-year old male."  (A.R. 139, 379).  Plaintiff's lungs were clear.  Dr. Smith renewed his prescriptions and indicated that plaintiff should be given a note for school allowing him to have his Proventil inhaler and to take two puffs before gym class.

Dr. Smith indicated that a referral would be made to Dr. Williams for an evaluation of plaintiff's possible ADHD.  (*Id.*).

On February 23, 2005, plaintiff's mother brought him back to Dr. Smith and related that for about two weeks plaintiff had experienced a harsh cough and sore throat.  Plaintiff was provided with prescriptions for Amoxicillin and Phenergan.  Dr. Smith wrote that plaintiff should miss a few days of school and that he would be sending a note to plaintiff's school indicating that he should avoid outdoor recess until the weather improved.  (A.R. 132, 374).

On May 10, 2005, plaintiff had a sore throat, coughing, headache, and copious nasal drainage.  Dr. Smith diagnosed plaintiff's condition as tonsilitis and bilateral otitis media, with early bronchitis.  He gave plaintiff prescriptions for Amoxicillin and Phenergan.  (A.R. 371-73).

Dr. Smith referred plaintiff to Douglas Homnick, M.D., for a pulmonary consultation.  On July 27, 2005, Dr. Homnick examined plaintiff.  (A.R. 304-09, 323-24).  He received a medical history indicating that plaintiff's wheezing had recently increased.  He was advised that plaintiff "had been to the emergency department once in November 2004, but ha[d] not received oral corticosteroids."  (A.R. 304).  Plaintiff was occasionally exposed to his grandmother's cigarette smoke in the car and inside the house.  Plaintiff had significant nasal congestion.  His chest was clear.  Pulmonary function tests indicated "mild airway obstruction with [a] FEV1 77% of predicted."  (A.R. 305, 309).  Dr. Homnick's diagnosis was moderate persistent asthma under fair control and severe allergic rhinitis under poor control.  (A.R. 305).

Plaintiff's July 29, 2005 sinus CT scan showed mild mucosal thickening in both maxillary sinuses, "right sphenoid sinus and patchy ethmoid air cells, [and] bilateral concha bullosa."  It also indicated "mucosal thickening along the inferior turbinates with obliteration of part of the

airway in the nasal fossa." (A.R. 310, 417).  On August 17, 2005, plaintiff's mother reported that his condition had improved, but he still experienced significant symptoms outdoors. (A.R. 329-30).

Plaintiff's August 25, 2005 pulmonary function tests produced a FVC of 1.724 liters (102.5% of predicted) and a FEV1 of 1.521 (100.5% of predicted). (A.R. 313, 336).  On August 25 and September 8, 2005, plaintiff received  notes authorizing his use of a rescue inhaler at school if necessary. (A.R. 206-07, 316-18).  Dr. Homnick offered a diagnosis of moderate, persistent asthma under fair control and severe, persistent allergic rhinitis under fair to poor control  (A.R. 336-37). On September 8, 2005, Dr. Smith provided a note stating that plaintiff's asthma prevented him from walking to his bus stop. (A.R. 365).

On November 23, 2005, plaintiff's mother reported an upcoming move to suburban Detroit. Dr. Smith encouraged her to find a physician for plaintiff in the Detroit area. (A.R. 366-67).

Stacy O'Dowd, M.D., referred plaintiff to Dale H. Stone, M.D., for an allergy evaluation. Dr. Stone conducted the evaluation on March 20, 2006.  Plaintiff's lungs were generally clear to auscultation and percussion without wheezing or crackles.  Pulmonary function tests were normal and revealed no evidence of restrictive or obstructive changes.   Immunotherapy was recommended to help reduce plaintiff's response to grass and tree pollen, dust mites, and dog and cat dander.  Zyrtec and Nasonex were added to his medications. (A.R. 283-88).

Peter Cooney, M.D., referred plaintiff to John E. Duplantier, M.D., for an allergy evaluation. (A.R. 243).  On December 5, 2006, Dr. Duplantier examined plaintiff.  Pulmonary function tests yielded a FVC of  2.04 liters (91% of predicted) and a FEV1 1.65 liters (82% of predicted). (A.R. 240-41, 244).  Plaintiff's lungs were clear and equal to auscultation bilaterally. "Allergy skin testing was attempted and showed reactivity to dust mites, dog dander, tree pollen,

grass pollen, wheat pollen, mold spores, peanuts and soybeans.  There was no reactivity noted to cat dander, egg white, egg yolk, cow's milk or wheat.  However, there was insufficient reactivity noted to histamine on testing and [J.L.M.] reported after the testing that he had taken loratadine this morning."  (A.R. 244).  Dr. Duplantier offered a diagnosis of "mild intermittent asthma" and perennial and seasonal allergic rhinitis and conjunctivitis.  Plaintiff was instructed to continue all his medications other than loratadine.  (A.R. 244).

On December 18, 2006, plaintiff returned to Dr. Duplantier's office, and the tests were repeated.  The skin test results were generally the same, and Dr. Duplantier offered the same diagnosis.  Plaintiff's lungs remained clear and equal to auscultation bilaterally.  Plaintiff's FVC was 1.99 liters (89% of predicted) and his FEV1 was 1.67 liters (82% of predicted).  Dr. Duplantier recommended that plaintiff's medications be continued and that immunotherapy injections be added to his allergy treatment regimen.  (A.R. 245-58).  On January 19, 2007, Dr. Duplantier wrote a note stating that plaintiff's asthma was triggered by the cold air and that he should be allowed to remain indoors for recess periods during the winter season.  (A.R. 259).

On March 5, 2007, plaintiff's FVC was 2.01 liters (86% of predicted) and his FEV1 was 1.66 liters (78% of predicted).  (A.R. 261).  On June 5, 2007, plaintiff's pulmonary function tests showed improvement: FVC of 2.13 liters (95% of predicted) and FEV1 of 1.63 liters (80% of predicted.  (A.R. 263).  His lungs remained clear.  Dr. Duplantier began treating plaintiff's allergy symptom flare with Flonase and stated that if the symptoms persisted, plaintiff should begin taking allergy shots.  (A.R. 265-66).

On July 25, 2007, Tracy Pierce, M.D., examined plaintiff.  Plaintiff's mother stated that he had food allergies, but he did not avoid those triggers.  Dr. Pierce noted that plaintiff

-11-

experienced "significant smoke exposure" at home.  "Several people in the home smoke either outside or in the garage, including Mom."  (A.R. 319).  Plaintiff's lung examination was unremarkable.  Dr. Pierce counseled plaintiff's mother "extensively on the need for smoking cessation." (A.R. 218, 320).

Plaintiff's August 8, 2007 pulmonary function tests returned normal results.  His FVC was 2.159 liters (97.9% of predicted) and his FEV1 was 1.813 liters (89.8% of predicted).  (A.R. 328).  His August 20, 2007 sinus CT scan showed (1) "lobulated/polypoid mucosal thickening in the maxillary sinuses redomstrated and slightly worsened on the right since 07/29/05," (2) "patchy mucosal thickening in the ethmoid sinuses and the sphenoid sinus on the right unchanged in the interval," (3) mucosal hypertrophy involving the nasal turbinates and septum improved in the interval, and (4) moderate adenoidal hypertrophy.  (A.R. 331).  On August 22, 2007, John Marks, M.D., noted that plaintiff's spirometry had improved with FVC at 111% of predicted and FEV1 at 105% of predicted.  (A.R. 334-35).

On August 27, 2007, Douglas Raedy, D.O., conducted a consultative examination regarding plaintiff's problems with sinus infections and enlarged nasal turbinates.  Dr. Raedy described plaintiff as a pleasant 8-year old in no apparent distress.  Plaintiff had no history of surgical intervention.  His CT scan showed evidence of chronic sinusitis.  Dr. Raedy stated that plaintiff would be scheduled for a turbinate excision, cauterization, and outfracture along with functional endoscopic sinus surgery and resection of the concha bullosa.  (A.R. 214, 220-21).

On September 5, 2007, a note was sent from Bronson Family Practice Portage to plaintiff's school.  The note stated that plaintiff should be allowed to use his inhaler before lunch recess and before gym class.  (A.R. 353).

-12-

On September 10, 2007, plaintiff was examined by Michael Park, M.D., of Advanced Allergy and Asthma Care.  Plaintiff had a poor histamine response.  His mother stated that he had taken Claritin the previous night.  No further tests were performed.  (A.R. 210-11, 226-27).

On September 20, 2007, plaintiff's mother reported that plaintiff was experiencing significant symptoms.  She indicated that plaintiff needed to use his nebulizer more and that she expected him to self-administer.  Dr. Marks noted that plaintiff's active problems were allergic rhinitis and moderate persistent asthma.  He advised plaintiff to continue taking his medications and return in three months for a follow-up examination.  (A.R. 341-42).

On November 1, 2007, plaintiff was examined at Bronson Methodist Hospital in preparation for surgery by Dr. Raedy.  (A.R. 222-25).  Plaintiff's mother canceled the surgery, but testified that plaintiff was going to have the surgery sometime in the future.  (A.R. 213, 463-64).

Plaintiff's December 20, 2007 pulmonary function tests provided a FVC that was 98.7% of predicted and a FEV1 that was 90.2% of predicted.  (A.R. 344).  Gregory Laurell, M.D., interpreted a November 20, 2007 "DX Sinus Paranasal 3V" as showing an opacification of the left maxillary sinus.  Plaintiff's other paranasal sinuses appeared to be clear.  There was no evidence of any significant nasoseptial deviation or other anomaly.  (A.R. 343).

The record summarized above shows that plaintiff did not have the "chronic pulmonary insufficiency" required by listing 103.02.  Further, plaintiff failed to satisfy the listing's part C severity requirement because the medical record did not establish the "frequent need for mechanical ventilation" or "nocturnal supplemental oxygen as required by persistent or recurrent episodes of hypoxemia." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 103.02(C); *see J.P. v. Astrue*, No. 5:07-cv-118, 2008 WL 554111, at * 2 (N.D. Tex. Feb. 28, 2008).  Plaintiff never required

-13-

mechanical ventilation.  There is no authority supporting plaintiff's argument that use of a nebulizer or inhaler constitutes "mechanical ventilation."  (Plf. Brief at 11; Reply Brief at 2-3).  Mechanical ventilation is an extrinsic means of providing for the exchange of air between the lungs and the environment accomplished either by negative pressure generated outside of the patient's chest and transmitted to the interior of the thorax in order to expand the lungs and allow air to flow in (used with patients having extreme weakness or paralysis of the chest muscles) or positive pressure in which gas is delivered into the airways and lungs under positive pressure producing positive airway pressure during inhalation via an endotracheal tube or nasal mask.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 2075 (31st ed. 2007).  Plaintiff never required mechanical ventilation.  He did not experience persistent or recurrent episodes of hypoxemia[4] and did not require nocturnal supplemental oxygen.  The ALJ's findings that plaintiff did not meet or equal the requirements of listing 103.02 are supported by more than substantial evidence.

The ALJ's findings that plaintiff did not meet or equal the requirements of listing 103.03 for asthma are supported by more than substantial evidence.  Plaintiff's impairment fell far short of part B's severity requirement requiring "[a]ttacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention occurring at least once every two months or at least six times a year."[5]  *See Mize ex rel. D.I.M. v. Commissioner*, 431 F. App'x 778, 780-81 (11th Cir. 2011).  Asthma attacks are defined as follows:

---

[4]Hypoxemia is deficient oxygenation of the blood.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 921.

[5]Plaintiff did not have any episodes of asthma-related inpatient hospitalization.

-14-

> [P]rolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting.

20 C.F.R. Pt. 404, Subpt P, App. 1 § 3.00(C). In order to satisfy the requirements of listing 103.03(B), "a child must have asthma with 'attacks.'" *Johnson ex rel. Mattox  v. Barnhart*, 148 F. App'x 838, 842 (11th Cir. 2005). Plaintiff did not carry his burden of providing medical evidence of "attacks" as required by listing 103.03(B). *See Adams ex rel. D.J.W. v. Astrue*, No. CIV-10-49, 2011 WL 1233596, at * 2 (E.D. Okla. Mar. 15, 2011); *Burrell ex rel. Davis v. Astrue*, No. 04-Civ. 9551, 2011 WL 197218, at * 8 (S.D.N.Y. Jan. 5, 2011); *Drayton ex rel. R.W. v. Astrue*, No. 09-2886, 2010 WL 2674448, at * 8 (D.N.J. June 30, 2010); *Lowery ex rel. J.B. v. Astrue*, No. 09-cv-458, 2010 WL 6404416, at * 4-5 (N.D.N.Y. June 30, 2010); *see also Houston ex rel. Houston v. Chater*, No. 96-6223, 1997 WL 12828, at * 1 (10th Cir. Jan. 15, 1997) (administration of home nebulizer treatments is not the equivalent of the intensive treatment required for an "attack" as defined by 20 C.F.R. Pt. 404, Subpt P, App. 1 § 3.00(C)); *Lightner ex rel. D.W. v. Astrue*, No. 1:09cv898, 2010 WL 4269148, at * 5 (M.D. Ala. Oct. 28, 2010) ("Treatment for asthma does not equate to treatment for asthma attacks under the listing."). The only hospital emergency room records plaintiff provided in support of his claim for SSI benefits are the September 28, 2004 records showing that he was treated for a minor cervical strain after a car accident. (A.R. 420-28). The ALJ's findings that plaintiff did not meet or equal the requirements of any listed impairment are supported by more than substantial evidence.

-15-

**2.**

Plaintiff argues that the ALJ should have found that plaintiff had "marked" limitations in at least two domains or a "severe"[6] limitation in at least one domain. (Plf. Brief at 11). He argues that the ALJ should have found more significant limitations in every domain. (Plf. Brief at 11-17; Reply Brief at 4-8). The Social Security Act states that the finding of the Commissioner as to any fact, if supported by substantial evidence, "shall be conclusive." 42 U.S.C. § 405(g); *see McClanahan*, 474 F.3d at 833. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Heston*, 245 F.3d at 534; *see Caudill v. Commissioner*, 424 F. App'x 510, 515 (6th Cir. 2011). Upon review, I find that the ALJ's factual findings with regard to all six domains are supported by more than substantial evidence.

1.   <u>Acquiring and Using Information</u>

The domain of acquiring and using information considers how well the claimant is able to acquire and use information, and how well he uses the information he has learned. 20 C.F.R. § 416.926a(g). The ALJ found that plaintiff had a less than marked limitation in acquiring and using information. The ALJ noted that plaintiff's intelligence tests were normal and that his reasoning and processing speed were normal. (A.R. 21, 202). Plaintiff's ability to acquire and use information was adversely impacted by his delays in speech and language development, but his reported deficits in academic performance were reported to be only one year below age level. (A.R. 21). Plaintiff

---

[6]I assume that plaintiff meant an "extreme" impairment rather than a "severe" impairment. A severe impairment would not suffice to establish plaintiff's disability at step 3 of the sequential analysis. A claimant does not equal a listed impairment unless he has an "extreme" limitation in one domain or "marked" limitations in two domains. 20 C.F.R. § 416.926a(d); *see Encarnacion*, 331 F.3d at 85.

emphasizes that a Kalamazoo Regional Education Service Agency (KERSA) report indicated that plaintiff was at least two years below grade level. (Plf. Brief at 12) (citing A.R. 116). The KERSA report is dated February 15, 2005, when plaintiff was only 6 years old, a first-grade student, and before he began taking prescription medication for his ADHD. In February and March 2006, plaintiff was a second-grade student working about one year below grade level. (A.R. 180, 196). Plaintiff's school attendance was sporadic, his family had moved several times, and for the first three years of his life, he had lived with his grandmother. (A.R. 186). October 15, 2007 school records relate that plaintiff's strengths included being respectful and his ability to get along with his peers. (A.R. 93). Plaintiff's report card for the first semester of third grade stated that he was proficient working and interacting cooperatively and showed respect for authority. His ability to listen and attend appropriately, follow directions promptly, demonstrate appropriate work habits, and organizing his belongings and materials was characterized as "developing." (A.R. 98). I find that the ALJ's factual finding that plaintiff had a less than marked limitation in acquiring and using information is supported by more than substantial evidence.

2.      Attending and Completing Tasks

The domain of attending and completing tasks considers how well the claimant is able to focus and maintain attention, and how well he begins, carries through, and finishes activities, including the pace at which he performs activities and the ease with which he changes them. 20 C.F.R. § 416.926a(h). The ALJ found that plaintiff had a less than marked limitation in this domain:

> The claimant has less than marked limitation in attending and completing tasks. The documentary record contains references to attention deficit hyperactivity disorder but medication was prescribed and successfully controls associated symptoms. However, there is no showing that a diagnosis of attention deficit hyperactivity disorder was ever confirmed

through objective testing and in any event, given medication, there is no showing that deficits in this domain were ever more than "less than marked."

(A.R. 22). Plaintiff argues that the ALJ should have found a greater level of restriction based on plaintiff's school records. (Plf. Brief at 13; Reply Brief at 5-6). The ALJ considered the entire record, including plaintiff's school records. The school records reveal that during his relatively brief career as a student, plaintiff had attended various schools in Michigan and Indiana. (A.R. 42, 64, 91). His kindergarten records for the 2003-2004 school year identify his ability to stay on task as a "plus," but note that he sometimes found it difficult to control his eagerness to share verbally. (A.R. 107-08). His first-grade records from 2005 state that he was making acceptable progress towards completing his assignments and being attentive in class. He "sometimes" experienced difficulty following instructions. (A.R. 110, 126). Plaintiff was a student in the Walled Lake School District in second grade. His teacher noted that he found the school's curriculum very challenging and frustrating. (A.R. 177-80). Classroom observations made in connection with a 2006 psychological evaluation noted that plaintiff was able to follow directions and work with his teacher and other students. (A.R. 201). Plaintiff "appeared to be an active listener when he worked with the teacher in a small group. He did not seem easily distracted from the work nor did he appear impulsive." (A.R. 201). A school history summary sheet indicated that plaintiff had attended a school in Indiana from August 2006 through June 2007, a school in Portage, Michigan from August 2007 through December 3, 2007, and a school in Edwardsburg, Michigan on and after December 3, 2007. (A.R. 91). Plaintiff's records from the first semester of third grade in Portage stated that his ability to follow classroom instruction was developing. (A.R. 98). The Portage School District's Individualized Education Program (IEP) for plaintiff included assistance to help him deal with

frustration and stressful situations, reading assistance, and speech and language therapy.  (A.R. 92-97).  No school records from Indiana or the Edwardsburg School District were submitted in support of plaintiff's claim for SSI benefits.

The medical records reveal that in August 2005, plaintiff's mother reported that he had ADHD and that Dr. Smith provided a Ritalin prescription.  (A.R. 368-69).  March 1, 2006, progress notes characterize plaintiff's ADHD as stable and controlled with medication.  (A.R. 278, 361).  Plaintiff began taking Concerta in August 2007.  (A.R. 363).  December 2007 progress notes state that plaintiff "focused better" on Concerta.  (A.R. 349).  The ALJ's finding that plaintiff had a less than marked limitation in attending and completing tasks is supported by more than substantial evidence.

### 3.   Interacting and Relating with Others

This domain considers how well the claimant is able to initiate and sustain emotional connections with others, develop and use the language of the community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others.  20 CFR 416.926a(i).  The ALJ found that plaintiff had a less than marked limitation in interacting and relating with others:

> The claimant has a less than marked limitation in interacting and relating with others.  The claimant's mother testified that the claimant does not play with friends his own age but the evidence does not show that the claimant has in any way engaged in isolative behavior. Teacher reports indicate that the claimant is generally well behaved and cooperates during examinations (see Exhibits 1-F, 2-F, 11-F and 16-F).  The only exception to this assessment is contained in a psychological evaluation (Exhibit 17-F), but that appears to have been primarily based upon the claimant's mother's reports, not on any observation of the claimant over any extended time.  Based on the totality of the evidence the undersigned sees no evidence that claimant's limitations in this domain have been any greater than "less than marked."

(A.R. 23). Plaintiff argues that the "weight of the evidence" indicates that he struggles with inappropriate, impulsive, and disruptive behavior. (Plf. Brief at 14). This court's appellate review of the Commissioner's final administrative decision does not encompass re-weighing the evidence. *See Walters v. Commissioner*, 127 F.3d at 528. "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton*, 246 F.3d at 772-73. "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Commissioner*, 336 F.3d at 477. Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Heston*, 245 F.3d at 534. The ALJ's finding that plaintiff had a less than marked limitation in interacting and relating with others easily withstands scrutiny under the deferential substantial evidence standard.

### 4.    Moving About and Manipulating Objects

This domain considers how well a child is able to move his body from one place to another and how a child moves and manipulates objects. These are called gross and fine motor skills. 20 C.F.R. § 416.926a(j). The ALJ found that plaintiff had a "marked" limitation in this domain:

> The claimant has a marked limitation in moving about and manipulating objects. The documentary record includes treating source reports which suggest that the claimant has significant exertional limitations due to asthma. However, the documentary record also indicates that the claimant's asthma is largely controlled with medication; pulmonary function testing has repeatedly been within normal limits and there has been little need for Emergency Room treatment for this condition. Therefore, while the claimant may nevertheless be reasonably assessed as markedly limited in this domain, there is no showing of an extreme limitation in this domain.

-20-

(A.R. 24).  Plaintiff argues that the ALJ should have found that he had a "severe" limitation.  (Plf. Brief at 15).  The social security regulations require an "extreme" limitation to establish a child's disability.  An "extreme" limitation "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(i).  Plaintiff's impairments did not satisfy this demanding standard.  I find that the ALJ's factual finding that plaintiff had a marked impairment in the domain of moving about and manipulating objects is supported by substantial evidence.

### 5.  Caring for Yourself

This domain considers how well a child maintains a healthy emotional and physical state, including how well a child satisfies his physical and emotional wants and needs in appropriate ways.  20 C.F.R. § 416.926a(k).  The ALJ found that plaintiff had a less than marked restriction in this domain.  (A.R. 24-25).  The ALJ noted that plaintiff's mother testified that he did not know how to brush his teeth and could barely dress himself.  (A.R. 475-81).  The ALJ found that this testimony was not fully credible because school records and testimony from plaintiff's grandmother indicated that plaintiff was able to perform most activities of self-care.  (A.R. 24-25, 490).  The ALJ's finding that plaintiff had a less than marked limitation in self-care is supported by more than substantial evidence.

### 6.  Health and Physical Well Being

This domain considers the cumulative physical effects of physical and mental impairments and any associated treatments or therapies on a child's functioning that were not considered in the child's ability to move about and manipulate objects.  20 C.F.R. § 416.929a(l).

The ALJ found that plaintiff had a less than marked limitation in health and physical well being (A.R. 25), and plaintiff has not shown that this factual finding was deficient under the deferential substantial evidence standard.

### 3.

Plaintiff makes a four-sentence argument that this case should be remanded to the Commissioner for application of the "whole child approach" under Social Security Ruling (SSR) 09-1p. (Plf. Brief at 17). This argument is patently meritless. It was impossible for the ALJ to violate SSR 09-1p. The ruling did not go into effect until March 19, 2009, more than a year *after* the ALJ's decision. *See Title XVI: Determining Childhood Disability Under the Functional Equivalence Rule – the "Whole Child" Approach*, SSR 09-1p (reprinted at 2009 WL 396031, at * 13 (SSA Feb. 17, 2009). Further, assuming that the SSR 09-1p had been in effect, the ALJ's decision would have satisfied its requirements. SSR 09-1p "did not develop an entirely original analytical framework, but rather explained and expanded upon the analysis previously performed." *Bielefeldt ex rel. Wheelock v. Astrue*, No. 09 C 50302, 2011 WL 3360013, at * 7 (N.D. Ill. Aug. 4, 2011) (citing 20 C.F.R. 416.926a(c)). Here, the ALJ considered how plaintiff functioned at home, at school, and in the community before addressing the six domains of functioning. (A.R. 19-21). He recognized that activities and impairments can impact more than one domain, and he carefully rated the severity of plaintiff's limitations in each domain. (A.R. 19-25). The ALJ's analysis would have withstood scrutiny under SSR 09-1p if the ruling had been in effect on the date of the ALJ's decision. *See* 2009 WL 396031, at * 1-10; *see also Wheelock*, 2011 WL 3360013, at * 7; *Foley ex rel. DD v. Astrue*, No. 2:10-cv-264, 2011 WL 2610186, at * 5-6 (D. Me. June 30, 2011).

**4.**

Plaintiff argues that the ALJ "failed to conduct a proper credibility analysis of claimant or claimant's witnesses" in violation of SSR 96-7p and *Rogers v. Commissioner*, 486 F.3d 234 (6th Cir. 2007).  (Plf. Brief at 17-18).  Credibility determinations concerning a claimant's subjective complaints are peculiarly within the province of the ALJ.  *See Gooch v. Secretary of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987).  It is the ALJ's function to determine credibility issues.  *See Siterlet v. Secretary of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).  The court does not make its own credibility determinations.  *See Walters v. Commissioner*, 127 F.3d at 528.  The court cannot substitute its own credibility determination for the ALJ's.  The court's "review of a decision of the Commissioner of Social Security, made through an administrative law judge, is extremely circumscribed . . . ."  *Kuhn v. Commissioner*, 124 F. App'x 943, 945 (6th Cir. 2005).  The Commissioner's determination regarding the credibility of a claimant's subjective complaints is reviewed under the deferential "substantial evidence" standard.  "Claimants challenging the ALJ's credibility determination face an uphill battle."  *Daniels v. Commissioner*, 152 F. App'x 485, 488 (6th Cir. 2005).  "Upon review, [the court must] accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the court] d[oes] not, of observing a witness's demeanor while testifying."  *Jones*, 336 F.3d at 476.  "The ALJ's findings as to a claimant's credibility are entitled to deference, because of the ALJ's unique opportunity to observe the claimant and judge [his] subjective complaints."  *Buxton v. Halter*, 246 F.3d at 773.  "Since the ALJ has the opportunity to observe the demeanor of the witness, his conclusions with respect to credibility should not be discarded lightly

-23-

and should be accorded deference." *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1234 (6th Cir. 1993); *see White v. Commissioner*, 572 F.3d 272, 287 (6th Cir. 2009).

In *Rogers*, the Sixth Circuit stated that meaningful appellate review requires more than a blanket assertion by the ALJ that "the claimant is not believable." *Rogers v. Commissioner*, 486 F.3d at 248. The Court of Appeals observed that Social Security Ruling 96-7p requires that the ALJ explain his credibility determination and that explanation "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers*, 486 F.3d at 248. SSR 96-7p, by its terms, relates to the credibility of plaintiff's testimony regarding his symptoms, not the testimony of his mother or grandmother. *See Policy Interpretation Ruling Titles II & XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, SSR 96-7p (reprinted at 1996 WL 374186, at * 3) (SSA July 2, 1996). SSR 96-7p states that the ALJ may consider evidence from "other sources of information" such as family members:

> Other sources may provide information from which inferences and conclusions may be drawn about the credibility of the individual's statements. Such sources may provide information about the seven factors listed in the regulations and may be especially helpful in establishing a longitudinal record. Examples of such sources include public and private agencies, other practitioners, and nonmedical sources such as family and friends.

1996 WL 374186, at * 8. Even assuming that SSR 96-7p applied to the other members of plaintiff's family who testified in support of his claim for SSI benefits, the ALJ provided a more than adequate explanation why he found that plaintiff's mother's testimony was not fully credible. Plaintiff's mother had not consistently lived with him until August 2007. (A.R. 20, 484). Her testimony was not supported by other evidence of record. Plaintiff's most stable residence was with his grandmother (A.R. 143, 186, 484-85, 489), and her testimony and plaintiff's school records revealed

that plaintiff was able to perform most activities of self-care, contrary to his mother's more extreme characterization.  (A.R. 25, 490).  Plaintiff's mother testified that he did not play with friends (A.R. 471, 478), but the record did not document this purported isolative behavior.  (A.R. 23, 98, 100, 105-08, 144, 178, 487).  The ALJ gave a more than adequate explanation why he found that plaintiff's mother's testimony was not fully credible.

### Recommended Disposition

For the reasons set forth herein, I recommend that the Commissioner's decision be affirmed.

Dated:   November 17, 2011          /s/  Joseph G. Scoville
                                         United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).   General objections do not suffice.  *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).